IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ALTHEA DAVIS, | : | Case No. 1:11cv288 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING PLAINTIFF'S |
| | : | MOTION FOR PARTIAL SUMMARY |
| MIDLAND NATIONAL LIFE | : | JUDGMENT AND GRANTING IN |
| INSURANCE CO., | : | PART AND DENYING IN PART |
| | : | DEFENDANT'S MOTION FOR |
| Defendant. | : | SUMMARY JUDGMENT |

This matter is before the Court on the parties' cross motions for summary judgment. The

Court heard oral argument on the motions on July 12, 2012. For the following reasons, Plaintiff

Althea Davis's Motion for Partial Summary Judgment (Doc. 34) is **GRANTED** and Defendant

Midland National Life Insurance Company's Motion for Summary Judgment (Doc. 42) is

**GRANTED IN PART and DENIED IN PART**.

I.     **BACKGROUND**[1]

Plaintiff Althea Davis ("Davis"), trustee of the Nanette M. Davis Living Trust, filed this

action to recover the death benefit of a life insurance policy (the "Policy") issued by Defendant

Midland National Life Insurance Company ("Midland") on the life of Davis's mother, Nanette

Davis. In her four-count Complaint, Davis claims that (1) Midland breached the Policy contract

by failing to pay the death benefits thereunder after her mother's death, (2) Midland breached its

fiduciary duty to her, and (3) Midland breached its duty to act in good faith when it refused to

pay her claim for benefits without justification, and (4) she has been damaged in the amount of

---

[1] Except as otherwise indicated, background facts are drawn from Plaintiff's Statement of
Proposed Undisputed Facts (Doc. 34-1) to the extent they are admitted in Defendant's Response
thereto (Doc. 50) and Defendant's Statement of Proposed Undisputed Facts (Doc. 43) to the
extent they are admitted in Plaintiff's response thereto (Doc. 46).

the stated benefit under the Policy ($250,000) plus interest and attorney's fees.  Davis filed the

case in state court, and Midland removed it to this Court on the basis of diversity jurisdiction.

Midland issued the Policy to Nanette Davis ("Nanette") on September 21, 2006, with a

death benefit worth $250,000.  The writing agent on the Policy was Ray Isaacs.  On October 25,

2006, Nanette suffered two brain aneurysms and a subarachnoid hemorrhage which caused her to

have a single-car accident.  She underwent surgery to correct the aneurysms and subarachnoid

hemorrhage on October 26th and remained hospitalized until November 7, 2006.  On that date,

Nanette was transferred from the hospital to a residential rehabilitation program.

When Nanette entered the residential rehabilitation program, the admitting physician

assessed Nanette as a "53-year-old status post subarachnoid hemorrhage with significant

cognitive deficits" and indicated on the history and physical form that Nanette was "markedly

confused."  Doc. 41-1 at 17 (MR-DRAKE 0027).  When Nanette was discharged from the

residential rehabilitation program more than two weeks later, on November 24, 2006, the

physician noted that Nanette had continued cognitive deficits.  Doc. 41-1 at 14 (MR-DRAKE

0019).  Specifically, the physician noted that Nanette "remained confused as to place and time"

and that her conversations were "disorganized and confabulatory."  *Id*.

After her discharge from the residential rehabilitation program, Nanette participated in

occupational and speech therapy on an outpatient basis five days a week at an adult day care

facility.  Nanette participated in the day rehabilitation program from November 28, 2006 through

February 2, 2007.  Her discharge summary from the day program reflects that staff "worked with

her for memory loss and any other deficits noted."  Doc. 41-1 at 81 (MR-ACTIVE 0001).  The

2

discharge summary prepared by the day program concluded with the statement that Nanette was "doing well and is planning to return to work.  Memory loss much improved." *Id*.

Nanette saw her general practitioner, Dr. Olga Duarte, three times after she suffered her aneurysms: on December 4, 2006; on or about March 5, 2007; and on July 9, 2007.  There are no medical records for Nanette in evidence dated later than July 2007.

On May 21, 2008, Nanette's life insurance Policy lapsed for nonpayment of premium. Nanette had sufficient funds to pay the premium and Isaacs, her insurance agent, does not know why the lapse occurred.  On July 29, 2008, Midland sent Nanette an Application for Reinstatement and a letter encouraging her to reinstate the Policy.  The Application for Reinstatement was a "short form" application --- a one-page document consisting of four "yes" or "no" questions.  Midland provided no explanation, directions, or guidelines on how to complete the short form Application for Reinstatement.  The letter instructed Nanette to complete the Application for Reinstatement and return it to Midland within thirty days along with the necessary premium payment.

Nanette brought the Application to Isaac's office.  Because Isaacs was not available, Nanette met instead with Isaacs's assistant, Cathy Pope.  Pope discovered that Nanette had signed the Application but had left certain sections blank.  Of particular importance, Nanette had not answered the following question:

> **Since the date of the original application or examination, whichever is earlier, for the above policy, has any person to be covered by the reinstated policy:**
>
> A.  Had any change in health?          □ Yes          □ No

Application for Reinstatement, Doc. 28-19.  Nanette had supplied an answer to the second question, which asked:

> B.  Consulted, been examined, or treated by a physician or medical practitioner?
>
> □ Yes          □ No

*Id*.  Nanette had checked the "yes" box and written that she had seen Dr. Olga Duarte, M.D., for a checkup.  Nanette also had answered the remaining two questions on the form: she checked "no" in response to question "C." asking whether she had made a change in occupation, the use of tobacco or drugs, participation in hazardous sports, or been arrested; and she checked "no" in response to question "D." regarding whether she had made an application to another life insurance company.

Pope does not specifically recall Nanette coming in to the office to drop off the form.  However, Pope knew from looking at the Application that she, not Nanette, had answered question "A." by inserting a slash mark in the box marked "no" to indicate that Nanette had not had any change in health.  Pope testified at her deposition that it was her normal procedure to review forms for completeness and to complete any items left blank after asking the client any relevant questions.  With respect to question "A." regarding change in health, Pope testified, "And then I would --- because I know protocol from being in insurance for so long, I said, now, Nanette, what's the answer to number A, and then I would have marked it for her."  Pope Dep. 46.[2]  Additionally, Pope inserted Nanette's name at the top of the Application and filled in the city, state, and date at the bottom.  Pope mailed the Application and premium check to Midland.

When Midland received Nanette's Application for Reinstatement, the document was reviewed by a "policy change technician."  The technician did not refer Nanette's Application to

---

[2] The deposition of Catherine Pope is filed at Doc. 33.

4

an underwriter for further review.  Midland accepted the Application and reinstated the Policy, effective August 14, 2008.  All premiums were paid on the reinstated Policy.

On December 9, 2009, Nanette was diagnosed with cancer.  She died from cancer on July 16, 2010.

On August 10, 2010, Davis, as trustee of the Nanette Davis Living Trust (the stated beneficiary on the Policy) submitted a claim for death benefits to Midland.  The claim was timely presented under the terms of the Policy.  Midland undertook a "contestable" policy investigation because, under the terms of the Policy and Midland's standard procedures, such investigation occurs in every case in which the insured dies within two years of the policy initiation or reinstatement.

In a letter dated November 15, 2010, Midland denied Davis's claim for death benefits. Midland denied the claim because it concluded that Nanette provided a false answer on her Application for Reinstatement.  Specifically, Nanette failed to reveal her aneurysms and subarachnoid hemorrhage and subsequent surgery.  Midland claimed that if Nanette had truthfully disclosed this medical history, then its underwriters would not have reinstated the coverage.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All reasonable inferences from the record must be drawn in the light most favorable to the nonmoving party, and the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec.*

5

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The moving party may

support the motion for summary judgment with affidavits or other proof or by exposing the lack

of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon

the pleadings but must go beyond the pleadings and "present affirmative evidence in order to

defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 257 (1986).  The task of the Court is not "to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.

## III.    ANALYSIS

Davis moves for summary judgment in her favor on her breach of contract claim.  She

does not move for judgment on the breach of fiduciary duty claim, nor does she move for

judgment on the bad faith claim which was bifurcated by Order of the Court.  Doc. 21.  Midland

moves for summary judgment in its favor on all Davis's claims.

### A.    Breach of Contract

A breach of contract claim requires proof of the existence of a contract, performance by

the plaintiff, breach by the defendant, and damages.  *Lucio v. Safe Auto Ins. Co.*, 919 N.E.2d

260, 267 (Ohio App. 2009).  Davis claims that all premiums were paid on the Policy and that

Midland breached the Policy when it wrongfully denied the claim for life insurance benefits.

Midland claims that it is legally entitled to deny coverage on Davis's claim under Ohio law

because Nanette willfully and fraudulently failed to disclose her aneurysms and subarachnoid

hemorrhage and subsequent surgery at the time she applied for reinstatement of her Policy, and it would not have reinstated the Policy under the same terms if it had known of this health history.

Ohio Revised Code § 3911.06 addresses whether an insurer may deny payment on a claim based on the insured's false answer on a life insurance application.  That statute provides as follows:

> No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer.

The Ohio Supreme Court construed the statute and articulated the following four-part test for determining whether an insurer can use a false answer on a life insurance application as grounds for rejecting a claim:

> An insurer may establish an answer to an interrogatory by an applicant for life insurance as a bar to recovery upon a policy by clearly proving that (1) in giving such answer, the applicant willfully gave a false answer (2) such answer was made fraudulently (3) but for such answer the policy would not have been issued and (4) neither the insurer nor its agent had any knowledge of the falsity of such answer.

*Jenkins v. Metro. Life Ins. Co.*, 173 N.E.2d 122, syllabus ¶ 1 (Ohio 1961).  Although this places the burden on the insurer to clearly prove that the applicant provided a false answer willfully and fraudulently, the *Jenkins* court went on to hold that once the insurance company demonstrated that the insured supplied a false answer, the burden then shifted to the policy claimant to prove that the false answer was supplied as a result of an honest mistake.  Specifically, the court held

that absent evidence "tending to prove that the insured made an honest mistake in giving such negative answer, such answer will be held as a matter of law to have been willfully false and fraudulently made." *Id*. at syllabus ¶ 3.[3]  The *Jenkins* decision comported with an earlier decision of the Sixth Circuit, *Lyttle v. Pacific Mutual Life Insurance Company*, 72 F.2d 140 (6th Cir. 1934).  In *Lyttle*, the Sixth Circuit construed the predecessor to Ohio Revised Code § 3911.06 and decided that where a statement is "falsely made with respect to a material matter, it will be presumed to have been made willfully and with intent to deceive." *Id*. at 142.

Guided by these decisions, courts have held that an insurer satisfies its burden of demonstrating willful falsity and fraudulent intent by producing evidence that the applicant knowingly provided a false answer.  For example, an Ohio appellate court affirmed the trial court's decision granting summary judgment to an insurer after concluding that the insured had falsely stated in his application that he had not, in the past two years, been diagnosed or treated for "uncontrolled high blood pressure" when, in fact, he had an extensive history of uncontrolled high blood pressure.  *Blakely v. Security Dollar Bank*, No. 2000-T-0105, 2001 WL 848581 (Ohio App. July 27, 2001).  The insured's wife contended that her husband had made an honest mistake about the seriousness of the condition because he was taking medication to treat it.  *Id*. at *3. However, the court determined that the evidence did not support that conclusion and,

---

[3] In *Jenkins*, the insured had stated on his life insurance application that he was last sick ten months earlier and was at that time treated by his doctor for a cold.  He further stated that he had not consulted any physician within the previous five years for any other reason.  In fact, the insured had consulted his doctor three other times within the relevant timeframe.  Thus, the court determined that the insured's answer on the insurance application was false.  Although there was no evidence that the insured had any fraudulent intent when responding falsely to the question, the court concluded that the insurer had presented enough evidence to shift the burden onto the insured to prove that he had made an honest mistake in falsely answering the question.

accordingly, the insured's negative response to the question regarding such treatment was deemed willfully false and fraudulently made as a matter of law.  *Id*. at *4.

Similarly, a judge in this District recently held in favor of an insurer after noting that "Courts interpreting [§ 3911.06] have recognized that false answers given by an applicant for insurance create a presumption beneficial to the insurance company" and that "[r]ecent decisions interpreting § 3911.06 agree that the insurer's burden of proof extends only to whether the insured knowingly provided a false answer."  *Spencer v. Minn. Life Ins. Co.*, 493 F. Supp. 2d 103, 1038 (S.D. Ohio 2007).  In *Spencer*, the insured had consulted a doctor and voluntarily obtained medication to treat his bipolar disorder within the three years preceding his application for insurance, yet he answered "no" to the question on the insurance application asking, "[d]uring the past three years, have you for any reason consulted a physician or other health care provider or been hospitalized?"  Thus, the burden shifted to the plaintiff to come forward with evidence explaining the falsity.  That the plaintiff could not do, and the court entered judgment in favor of the insured.

Midland seeks to analogize the facts of this case with those in *Spencer* and *Blakely*.  It argues that because Nanette had two aneurysms and a subarachnoid hemorrhage on October 25, 2006 and had corrective surgery the following day, the answer "no" to the question whether she had "had any change in health" since the original application was false.  Midland argues that the Court must presume that Nanette made the false statement willfully and fraudulently because Davis has not met her burden to rebut that presumption with evidence that Nanette made an honest mistake in supplying the false answer.

9

The Court disagrees and finds that Midland has not satisfied its burden of demonstrating that Nanette's answer of "no" to the question whether she "had any change in health" was false. In contrast to *Blakey* and *Spencer*, the situation before the Court concerns a short reapplication form with a very broad question designed to uncover unspecified changes in the insured's health. Nowhere in the Application for Reinstatement is "change in health" defined, nor does the Application include any examples of what type of information Midland expected to receive.  As a result, the phrase, "change in health" is susceptible to several different interpretations.

Agent Ray Isaacs admitted that the question on the short form Application for Reinstatement asking an insured whether she had had a "change in health" could be interpreted in many different ways, in part because Midland gives no instruction or direction as to what medical conditions need to be disclosed.[4]  Isaacs testified that he did not believe Nanette answered the question, "no" with an intention to deceive Midland.  Rather, Isaacs said, "[s]he could have maybe not understood the question."  Isaacs Dep. at 98.

Midland senior claims analyst Kim Mathison likewise acknowledged that Midland provides its insureds with no definition of the meaning of a "change in health" and no instruction or direction on what conditions constitute a "change in health" significant enough to require

---

[4] When asked at his deposition whether his insurance clients could have varying interpretations of the question, "have you had a change in health," Isaacs responded:

> A.  Well, they could in any question like that without a regular application, even on a health insurance application. . . .  [A question on an application will] ask have you been treated for anything within the last five years.  Well, treated, I mean, are we talking about getting a vaccine for the flu, are we talking about I had cancer, I had a heart attack, I had diabetes, you know, what are you being treated for?  I mean, everybody's open to what's relevant there.
>
> Q.  And, for example, if you had a customer who had a health issue a year, year and a half earlier but felt that they had fully recovered from it, you could understand that they may mark that box no, right?
>
> A.  . . . Yah, they could.

Isaacs Dep. 94-95.  The deposition of Ray Isaacs is filed as Doc. 28.

10

disclosure. Mathison Dep. at 85-86.[5] When asked whether an insured would have to disclose a cold or flu, Mathison said "no." But when asked whether an insured would have to disclose a broken bone, Mathison struggled with her response, saying "I guess we don't have a definition on this, what's required." *Id*. at 87. When counsel asked Mathison, "if a person . . . two and a half years before completing this application had a change in heath, but that change in health has resolved and they are back to the same health condition they were in at the time of the original application. Do you understand that an insured could read this as saying I don't have a change in health?" Mathison responded, "Possibly." *Id*. at 89-90. Ultimately, Mathison acknowledged that she did not know how an insured was to understand where the line was regarding what she was supposed to disclose and what she didn't need to disclose. *Id*. at 90.

Conversely, Roger Hofer, underwriting manager for Midland, opined than an insured should disclose any and every change she had in health since her initial application, even a cold or flu. Hofer Dep. at 26.[6] He testified that the Application for Reinstatement is very clear that there is no question what type of information the insured is required to provide.

The differing opinions of Mathison, Isaacs, and Hofer --- in combination with the undisputed fact that Midland provided no instructions or parameters for answering the questions on the Application --- constitute evidence that the question regarding whether the insured has "had any change in health" is reasonably susceptible of more than one interpretation. Under Ohio law, "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, syllabus (Ohio 1988). The Application

---

[5] The deposition of Kimberly Mathison is filed as Doc. 40.
[6] The deposition of Roger Hofer is filed as Doc. 36.

for Reinstatement, together with the original Policy and the original Policy application, constitute the contract of insurance in this case.  Midland Proposed Undisputed Fact ¶ 12.  Because the Application for Reinstatement is part of the insurance contract, and because the Application is reasonably susceptible to more than one interpretation, the Court must construe it liberally in favor of Nanette.[7]

"[W]ords and phrases used in an insurance policy must be given their natural and commonly accepted meaning."  *Gomolka v. State Auto Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982).  "The insurer, having prepared the policy, must also be prepared to accept any reasonable interpretation . . . in favor of the insured."  *Id*.  "Change" is defined as "1.  The act, process, or result of altering or modifying . . . 2.  The replacing of one thing for another; substitution . . . 3.  A transformation or transition from one state, condition, or phase to another."  American Heritage Dictionary of the English Language, 4th ed. (2000).  "Health" is defined as "1.  The overall condition of an organism at a given time."  *Id*.  Therefore, the phrase "change in health" connotes a condition that has been permanently altered when compared at two different points in time.

Nanette could reasonably have believed that her aneurysms and subarachnoid hemorrhage did not constitute a "change in health" because they were surgically corrected, thus returning her to the same condition she was in prior to those events.   Her aneurysms and hemorrhage occurred on October 25, 2006, and her corrective surgery occurred a day later.

---

[7] Law in other jurisdictions simplifies the analysis considerably.  Under New York law, for example, "[a]n answer to an ambiguous question on an application for insurance cannot be the basis of a claim of misrepresentation by the insurer against its insured where a reasonable person in the insured's position could rationally have interpreted the question as he or she did."  *Joseph v. Great Lakes Reins. (UK) PLC*, No. 3:07cv3474, 2010 WL 1007695, at *5 (N.D. Ohio March 16, 2010) (applying New York law).

While she suffered some cognitive and memory problems as a result, her rehabilitative treatment regarding these problems concluded in February 2007.  Nanette applied for reinstatement of her Policy in August 2008 --- nearly two years after surgical correction of her aneurysms and sixteen months after she had completed her rehabilitation.  Under these circumstances, it is reasonable to conclude that Nanette believed her health at the time she completed the Application for Reinstatement was no different from her health in September 2006 when the Policy first went into effect.  Thus, construing the language of the Application in favor of Nanette, the answer "no" to the question asking whether her health had "changed" was not false.

Even if the Court were to construe Nanette's negative response to the "change in health" question as false, there is evidence that she made an honest mistake in giving such an answer.  There are numerous references in Nanette's medical records made after her surgery and before her last therapy session in February 2007 to her forgetfulness.  Although her discharge summary indicates that her memory loss had "much improved," there is nothing in the record to indicate that Nanette completely regained her memory, in particular regarding the event of her aneurysms.  In fact, there is nothing in the record whatsoever to indicate what Nanette recalled about her specific health history at the time she applied for reinstatement of her policy.

In *Blakey* and *Spencer*, on which Midland largely rely, there was no evidence that the insureds had any medical history that might have impacted their ability to recall their medical histories.  This case must be distinguished from those because the very condition which Nanette did not disclose was itself the source of her documented memory deficits.  There is no precedent for applying the presumption that a false answer on a life insurance application is made willfully and with an intent to deceive when the very condition not disclosed involved the brain and had a

13

documented impact on the memory of the insured.  A lingering memory deficit could have impacted Davis's ability to recall the aneurysm and/or whether it continued to constitute a "change in health."  For these reasons, Midland has failed to satisfy its burden of proving, by clear and convincing evidence, that Nanette knowingly provided a false answer on the Application for Reinstatement.

Midland sets forth additional arguments in support of its motion for partial summary judgment.  Specifically, Midland argues that it has proven the remaining factors of the § 3911.06 test, that is, that Nanette's false response was "material" and that neither the insurer nor its agent had any knowledge of the falsity of the response.   Davis disputes that the facts demonstrate materiality, and she claims that she told Isaacs, the agent, about Nanette's aneurysms.[8]  The Court need not address these arguments over the remaining factors of the § 3911.06 test because Midland failed to satisfy its initial burden under the statute of proving by clear and convincing evidence that Nanette knowingly provided a false answer on the application.  Having failed to meet that burden, Midland cannot rely on Ohio Revised Code § § 3911.06 as a basis for denying Davis's claim on Nanette's life insurance policy.

Davis presented uncontested evidence that the Policy existed, that Nanette performed her obligations by paying the premiums, that Midland breached the Policy by refusing to pay the death benefit owed thereunder, and that she has been damaged as a result in the amount of the stated benefit of the Policy.  Because Midland failed to demonstrate a valid defense for its failure

---

[8] Davis also argues that Midland is barred from seeking to void the policy on misrepresentation grounds because a misrepresentation in an insurance policy application may void the policy only before a loss occurs, citing *Allstate Insurance Company v. Boggs*, 271 N.E.2d 855 (Ohio 1971). *Allstate* concerned the consequences of a misstatement of fact by an insured on an automobile insurance policy.  The Court need not address this argument because application of the primary authority on this subject, Ohio Revised Code § 3911.06, resolves the matter in Davis's favor.

14

to pay the Policy benefit, Davis is GRANTED summary judgment on her breach of contract claim.

### B.     Breach of Fiduciary Duty

Although neither party briefed the issue of Davis's breach of fiduciary duty claim, the Court finds that the claim is not supported by the evidence.  Under Ohio law, the relationship between an insurance agent and an insured, without more, is not a fiduciary relationship but an ordinary business relationship.  *Long v. Time Ins. Co.*, 572 F. Supp. 2d 907, 914 (S.D. Ohio 2005); *Slovak v. Adams*, 753 N.E.2d 910, 916 (Ohio App. 2001).  "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 419 N.E.2d 1094, 1097-98 (Ohio 1981) (citing *In re Termination of Employment*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (Ohio 1974)).

Davis's fiduciary duty claim must fail because she named Midland, the insurance company, and not Isaacs, the insurance agent, as the sole defendant in this case.  Furthermore, even if she had named Isaacs as a defendant, Davis did not allege any facts to support a finding that the relationship between Nanette and Isaacs was anything other than an ordinary business relationship.  Thus, Midland's Motion for Summary Judgment on the fiduciary duty claim is GRANTED.

### C.     Bad Faith

Although Midland purports to move for judgment in its favor on Davis's bad faith claim, it did not provide the Court with any briefing or argument on the issue.  Further, the Court ordered that this claim be bifurcated.  Ruling on this claim in the absence of any briefing and in

15

contravention of the decision to bifurcate the issue would be improper.  Accordingly, Midland's

motion for summary judgment on the claim of bad faith is DENIED.

**III.    CONCLUSION**

For the foregoing reasons, Plaintiff Althea Davis's Motion for Partial Summary Judgment

(Doc. 34) is **GRANTED** and Defendant Midland National Life Insurance Company's Motion for

Summary Judgment (Doc. 42) is **GRANTED IN PART AND DENIED IN PART**.  Judgment

is hereby granted to Davis on her breach of contract claim; judgment is granted to Midland on

Davis's breach of fiduciary duty claim.  Davis's bad faith claim remains pending.

IT IS SO ORDERED.


S/Susan J. Dlott
Chief Judge Susan J. Dlott
United States District Court